775 P.2d 629

**Sachiko SWANSON,
Claimant–Appellant,**

v.

**KRAFT, INC., employer and Ideal Mutual Insurance Company, surety,
Defendants–Respondents.**

No. 17358.

Supreme Court of Idaho.

June 7, 1989.

Racine, Olson, Nye, Cooper & Budge, Pocatello, for claimant-appellant. Mr. John B. Ingelstrom argued.

Moffatt, Thomas, Barrett, Rock & Fields, Boise, for defendants-respondents. Ms. Glenna M. Christensen argued.

JOHNSON, Justice.

This is a worker's compensation case. The issues presented in this appeal are: (1) whether the Industrial Commission made sufficient findings of fact to allow effective

appellate review; (2) whether the Commission should have placed the burden of proof on the employer (Kraft) and its surety (Ideal Mutual) regarding the causative effect of an automobile accident in which the claimant (Swanson) was involved subsequent to the work-related accident; (3) whether the Commission properly applied the applicable rules of causation; and (4) whether the Commission's findings of fact were supported by substantial competent evidence. We uphold the Commission's decision as to each of these issues. We also hold that we have no authority to award attorney fees against a worker's compensation claimant on appeal.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

On January 8, 1981, Swanson was struck in the head by a heavy metal door while she was working for Kraft. She sustained a cut above her right eye and a strain of her neck. She was taken to the hospital where the cut was sewn up. Although she had neck pain and a headache she returned to work that day. Shortly after returning to work, Swanson was sent home because she could not continue working. During the next several days she was treated for headaches and a stiff neck. On January 21, 1981, Swanson attempted to return to work. She became ill at work and was again taken to the hospital, where she was examined by an orthopedic surgeon who referred her to a neurologist, Dr. Kennedy. After being examined by Dr. Kennedy, Swanson was admitted to the hospital for evaluation. She complained of considerable pain, and the right side of her face and neck was tender. During her hospitalization, she was also seen by a neurosurgeon. X-rays of her head and neck and a brain scan revealed no abnormalities. She was discharged from the hospital on January 27, 1981. The diagnosis was headache and muscle spasms of the neck caused by the blow to her head on January 8, 1981.

Swanson telephoned Dr. Kennedy on February 2 and 9, 1981. On both occasions she reported that she was improving and was increasing her activity. On February 9, 1981, Dr. Kennedy advised Swanson that she could return to work on February 16, 1981. Swanson testified that on February 13, 1981, she telephoned Dr. Kennedy's office to tell him that she did not believe she would be able to return to work on February 16th. Swanson stated that she was unable to reach Dr. Kennedy, but spoke to someone in his office. There were no records in Dr. Kennedy's office confirming that Swanson called his office on that day.

On February 15, 1981, Swanson went for an automobile ride with her husband and a friend. During the trip an accident occurred in which the automobile in which Swanson was riding struck a guard rail. At the time of the accident, Swanson was asleep in the front seat with her head on her husband's lap. She struck her head and received an abrasion on her forehead. Following the accident, she complained of nausea and increased pain in her neck, back and arms. She was again taken to the hospital where she was examined by Dr. Kennedy the next day. She complained of an intense headache and was tender and had muscle spasms in the neck. She was hospitalized for observation until she was discharged on February 19th. At that time Dr. Kennedy's diagnosis was that she had received an acute strain of the neck in the automobile accident as well as an "exacerbation" of the injury to her neck she had received on January 8, 1981. He later clarified that he used the word "exacerbation" to mean "recurrence." He was of the opinion that Swanson's symptoms from the accident of January 8, 1981, (the work-related accident) had essentially resolved prior to the automobile accident of February 15, 1981, (the automobile accident). Dr. Kennedy continued to see Swanson after her discharge from the hospital. In March 1981, she became ill at work. Her neurological examination was normal, but she had tenderness and muscle spasms in her neck. Dr. Kennedy noted that a "significant psychological component" could not be ruled out.

Before the work-related accident, Swanson had a history of treatment for anxiety

and other emotional problems. She had been hospitalized for these conditions in 1971 and again in 1976. Swanson was Japanese and had come to the United States in the 1950's after marrying her husband, who was an American serviceman stationed in Japan. Her emotional problems appear to have been related to her difficulty in adjusting to life in the United States and to problems in her marriage. In March 1981, Dr. Kennedy suggested that Swanson pursue psychological counseling, which she did. In June 1981, Dr. Kennedy noted that Swanson had been in therapy with a psychologist and that the psychologist had been amazed at the amount of stress, anxiety and tension in her life.

Swanson continued to report headaches and neck pain. In November 1981, she was examined by a neurosurgeon, Dr. Powell, who noted that her symptoms were predominantly subjective and that there were no abnormal neurologic findings. He also noted that she would be likely to improve with continued medical supervision and psychiatric counseling. He referred her to a pain clinic, which she attended.

Swanson continued to complain of head and neck pain. She was treated for this pain at a hospital in Salt Lake City in 1983 and 1984. She also continued to be absent from her work frequently.

In 1985 Swanson began seeing Dr. Whitenack, a family doctor who specializes in pain control management. He diagnosed her condition as myofascial pain, which he defined to mean pain coming from the soft tissues related to trigger points in the soft tissues and resulting muscle spasms secondary to pain and tenderness of the trigger points. It was Dr. Whitenack's opinion that Swanson's condition was caused by the work-related accident. He based this opinion on the history furnished to him by Swanson. He also believed that Swanson had encountered cultural differences in coming to the United States from Japan and also had a language barrier, which created emotional and adjustment issues which may also have contributed to her difficulties. Dr. Whitenack believed that these factors had combined with the injury

in the work-related accident to produce Swanson's continuing problems.

In May 1985 Swanson was examined by a neurologist, Dr. Henson, at the request of Kraft and Ideal Mutual. Dr. Henson found no objective basis for Swanson's complaints. He did not attribute Swanson's symptoms to the work-related accident. He believed that any psychiatric impairments Swanson had was not the result of either the work-related accident or the automobile accident. He attributed her neck symptoms to tension and stress rather than to physical injuries.

Ideal Mutual paid Swanson's medical and temporary disability benefits for the period after the work-related accident up to the date of the automobile accident. After the automobile accident, Ideal Mutual refused to pay Swanson any further benefits. In December 1983 Swanson filed an application for hearing with the Commission seeking further compensation. Kraft and Ideal Mutual answered, denying that there was any further liability to Swanson for compensation due to the work-related injury. They alleged that Swanson's condition was attributable to a preexisting injury, infirmity or condition. Swanson has appealed from the Commission's decision denying additional medical or income benefits as a result of the work-related accident.

## II.

## THE COMMISSION MADE SUFFICIENT FINDINGS.

■ Swanson asserts that the Commission failed to make sufficient findings of fact to allow effective appellate review. Specifically, she contends that the Commission did not determine when the injuries and symptoms from the work-related accident completely resolved. She also contends that the Commission made no determination of the contributing causation of the work-related accident and the automobile accident. Swanson argues that the Commission should have determined whether the automobile accident constituted a superceding, intervening event of such overriding significance to relieve Kraft and

Ideal Mutual of liability. She also argues that the Commission should have determined whether her psychological, emotional, cultural and marital difficulties were precipitated, aggravated, accelerated or "lit up" by the work-related accident. We reject each of these assertions, contentions and arguments.

The Commission found that Swanson's complaints for which she sought compensation were not attributable to the work-related accident. This finding is sufficient to allow us to review the Commission's decision denying further compensation to Swanson. In *Madron v. Green Giant Company,* 94 Idaho 747, 497 P.2d 1048 (1972) this Court held that it is not necessary for the Commission "to make detailed findings on every fragment of evidence presented to it. The only requirement in this regard is that the [Commission] make findings of fact sufficient to support its award and which will enable this court on appeal to assess the propriety of that award in light of such findings." *Id.* at 751, 497 P.2d at 1052. The additional findings that Swanson contends the Commission should have made were not necessary to support the decision of the Commission nor were they necessary for our review.

The Commission found that the complaints for which Swanson sought compensation were not attributable to the work-related accident. The Commission noted: "There is considerable medical opinion that [Swanson's] conditions do not relate to the industrial accident but instead are attributable to psychological factors." The Commission accepted the opinions of Dr. Kennedy, Dr. Powell and Dr. Henson over that of Dr. Whitenack as to the causation of Swanson's problems and denied her further compensation. The Commission's findings that Swanson's complaints were not attributable to, nor caused by, the work-related accident support the Commission's decision that Swanson was not entitled to additional medical or income benefits. If her complaints were not attributable to, nor caused by, the work-related accident, she was not entitled to any further compensation.

It was also not necessary for there to be additional findings to permit this Court to review the Commission's decision. Whether Swanson's injuries and symptoms from the work-related accident had completely resolved or not, does not impugn the Commission's determination that Swanson's complaints after the automobile accident were not caused by the work-related accident. Swanson's argument that the Commission's findings are deficient because they do not determine the contributing causation of the work-related accident and the automobile accident also does not persuade us. It is clear to us that the Commission found that neither of the two accidents was the cause of Swanson's continuing problems. The Commission found that Swanson's condition for which she seeks further compensation was the result of psychological factors independent of her accidents.

Swanson also argues that the Commission should have determined whether these psychological conditions were "precipitated, aggravated or lit up" by the work-related accident. The findings of the Commission that Swanson's complaints were not attributable to, nor caused by, the work-related accident disposes of this argument also. The Commission's findings are sufficient to rule out that Swanson's psychological conditions were precipitated, aggravated or lit up by the work-related accident.

## III.

### THE COMMISSION PROPERLY PLACED THE BURDEN OF PROOF ON SWANSON.

Swanson asserts that the Commission should have placed the burden of proof on Kraft and Ideal Mutual to prove that she was not entitled to medical and income benefits after the automobile accident. To the contrary, we conclude that the Commission properly placed the burden on Swanson to prove that she was entitled to further benefits.

The Commission concluded that Swanson had failed to sustain her burden of proving that she was entitled to additional medical or income benefits as a result of the work-

related accident. Swanson acknowledges that this Court has usually placed the burden on the claimant to prove that the claimant is still in the recovery period. *Paulson v. Idaho Forest Industries, Inc.*, 99 Idaho 896, 902, 591 P.2d 143, 149 (1979). However, Swanson argues that *Malueg v. Pierson Enterprises*, 111 Idaho 789, 727 P.2d 1217 (1986) is authority for the proposition that once an employee has been awarded disability benefits the burden rests with the employer to prove a change in the status of the employee. In *Malueg*, there was no substantial controversy that the claimant was still undergoing the healing process at the time the employer and its surety sought to terminate benefits. The decision of this Court to place the burden of proof on the employer and its surety was premised on the fact that the claimant had established by medical evidence that he was still within the period of recovery from the work-related accident. Here, the Commission found that Swanson was not within the period of recovery at the time Kraft and Ideal Mutual declined to provide further benefits. Therefore, the Commission properly placed the burden on Swanson to prove that she was entitled to further benefits.

## IV.

## THE COMMISSION PROPERLY APPLIED THE RULES OF CAUSATION.

Swanson asserts that the Commission did not properly apply the applicable rules of causation in deciding whether she was entitled to further benefits because of the work-related accident. Swanson contends that the Commission (1) did not apply the proper rules and standards for evaluating the effects of the automobile accident, (2) did not apply the rule that the employer takes an employee as the employer finds the employee, and (3) improperly considered non-medical factors in denying Swanson further benefits. We conclude that the Commission properly applied the rules of causation.

■ In deciding that the work-related accident did not cause the conditions for which Swanson sought compensation, the Commission found "particularly persuasive the opinion of Dr. Kennedy, who had the opportunity to treat [Swanson] both before and after the intervening automobile accident." The Commission noted that Dr. Kennedy was of the opinion that Swanson's symptoms from the work-related accident had "essentially resolved prior to the automobile accident." Based on this evidence, the Commission was entitled to conclude that the automobile accident was not a subsequent, intervening accident. Therefore, there was no necessity for the Commission to determine whether the automobile accident caused Swanson's complaints. In effect, the Commission determined that the automobile accident did not intervene to combine with the results of the work-related accident. As we read the Commission's findings, they do not attribute Swanson's continuing complaints either to the work-related accident or to the automobile accident, but rather to psychological factors.

■ Swanson argues that Kraft and Ideal Mutual should be liable for medical and income benefits due to any psychological and emotional problems that Swanson had prior to the work-related accident. This argument is premised on the principle: "An employer takes an employee as he finds him." Swanson cites *Wynn v. J.R. Simplot Company*, 105 Idaho 102, 666 P.2d 629 (1983) and *Bowman v. Twin Falls Construction Co., Inc.*, 99 Idaho 312, 581 P.2d 770 (1978) as authority for this principle. As we have recently pointed out:

This concept ... can be traced to language contained in *McNeil v. Panhandle Lumber Co.*, 34 Idaho 773, 793, 203 P. 1068, 1075 (1921); "[I]t may truly be said that our compensation law makes no distinction between wise and foolish, skilled and unskilled, healthy and unhealthy employees." ... As applied in *Wynn*, this concept of taking an employee as the employer finds him, caused this Court to reverse a decision of the Commission in which the claimant was denied benefits where he suffered a ruptured cervical disc. The Commission based its decision

on the claimant's history of nonwork-related activities including being a rodeo performer. The Commission found that the claimant's spine had "become predisposed to the injury which he ultimately sustained." *Wynn*, 105 Idaho at 104, 666 P.2d at 631. This Court concluded: "The injury produced the symptomatology and the disability from which claimant suffered." *Id.* at 105, 666 P.2d at 632. *See also, Bowman*, 99 Idaho at 315, 581 P.2d at 773.

*Horton v. Garrett Freightlines, Inc.*, 115 Idaho 912, 919, 772 P.2d 119, 126 (1989).

Here, Swanson had a history of psychological and emotional problems relating to her marriage and to her adjustment to living in this country. She had been hospitalized for severe tension, anxiety, confusion, emotional strain and hallucinations. The Commission found that Dr. Whitenack believed that Swanson "had encountered cultural differences in coming to the United States from Japan and also had a language barrier, which created certain emotional and adjustment issues which may also be a factor in [Swanson's] difficulties." Dr. Whitenack believed that these factors had combined with Swanson's work-related injury to produce her continuing problems. The Commission accepted the opinions of Dr. Kennedy, Dr. Powell and Dr. Henson that there was no combination of Swanson's preexisting psychological and emotional problems with the work-related injury to produce her continuing problems. Therefore, in the language of *Wynn*, the work-related injury did not produce the symptomatology and the disability from which Swanson suffered. The basic premise did not exist in this case for applying the principle of taking an employee as the employer finds the employee.

■ We also find no merit in Swanson's contention that the Commission improperly applied the nonmedical factors in this case. The thrust of Swanson's argument is that the social, cultural, psychological and emotional factors were turned against Swanson to deny her further compensation. We perceive that the Commission relied on these nonmedical factors to unravel what Dr. Kennedy referred to as "an enormously complicated situation." The fact that the Commission found these preexisting nonmedical factors to be the cause of Swanson's continuing problems does not indicate that the Commission turned them against her. It merely indicates that the Commission was carrying out its duty to determine whether a claimant is entitled to compensation because of a work-related injury. We are not prepared to second guess the Commission's judgment in doing so.

## V.

### THERE IS SUBSTANTIAL COMPETENT EVIDENCE TO SUPPORT THE FINDINGS.

■ Swanson asserts that the Commission's findings are not supported by substantial competent evidence. After a review of the record, only one portion of her argument on this issue causes us any pause. Swanson contends that Dr. Kennedy's testimony that the symptoms caused by the work-related accident had resolved before the automobile accident was not competent. After analyzing the evidence on this point, we disagree.

Dr. Kennedy acknowledged that he did not see Swanson after she was released from the hospital on January 27, 1981, until February 16, 1981, when he again saw her in the hospital following the automobile accident. He stated that he talked to Swanson by phone on February 2 and 9, 1981. When asked the basis of his testimony that he had tentatively released Swanson to return to work on February 16, 1981, Dr. Kennedy stated:

[O]n February 23 I wrote a letter, and this was after her second hospitalization, that it had been anticipated that she would return to work on February 16. I do not have recorded in my notes on what that was arrived at, but that was after the second accident, and somehow at that point in time I would have had information to make that statement, whether it was talking with her in the hospital and finding out that her symptoms had essentially resolved or what.

Otherwise I would have dictated the letter that her symptoms persisted and had been worsened by the accident rather than stating flatly at that time in regards to the industrial accident she had been released to work.

Dr. Kennedy also testified that in his telephone conversation with Swanson on February 9, 1981, he told her to increase her housework gradually, and that he hoped to get her back to work by February 16, 1981. This is confirmed by Swanson's own testimony that on February 9th Dr. Kennedy released her to return to work on February 16th. Swanson testified that she called Dr. Kennedy's office on February 13th to tell him that she was sick, was dizzy, had a headache, had a swollen arm, and couldn't move her arm very well. She said she didn't think she could go to work on February 16th. Swanson admitted that she did not speak to Dr. Kennedy on February 13th but only to a young woman who told her the doctor was not in that day and to call again on February 16th. Dr. Kennedy testified that there was no record in his office of a phone call by Swanson on February 13th. He said it was the policy of his office that if a patient called and if the doctor were not available, his secretaries would make note of the call in the patient's chart. The Commission was entitled to weigh the testimony offered on this point to determine whether Dr. Kennedy had a sufficient foundation for his opinion. We reject the contention that Dr. Kennedy's testimony was not competent evidence to support the finding that Swanson's symptoms from the work-related accident had essentially resolved prior to the automobile accident.

## VI.

### NO ATTORNEY FEES MAY BE AWARDED AGAINST THE CLAIMANT.

Kraft and Ideal Mutual assert that they are entitled to an award of attorney fees against Swanson. They cite *Shriver v. Boise Airport Super 8 Motel*, 105 Idaho 725, 672 P.2d 1055 (1983) as authority for the award. In *Shriver* this Court stated that attorney fees would have been granted against the claimant if they had been requested. No authority for this statement was cited. We take this opportunity to announce that despite the dicta in *Shriver*, we have no authority to award attorney fees against an unsuccessful claimant.

I.C. § 72–804 (1973) provides for the award of attorney fees against an employer or the employer's surety in worker's compensation cases, but not against a claimant. I.C. § 72–201 (1973) abolishes all civil actions and civil causes of action for personal injuries in cases covered by the worker's compensation system. I.C. § 12–121 (1988 Supp.) and I.R.C.P. 54(e)(1) (1987) do not apply to worker's compensation cases, since they provide for the award of attorney fees to a prevailing party in civil actions. *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979) premised the award of attorney fees against unsuccessful appellants in civil cases on a reading of I.C. § 12–121 and I.R.C.P. 54(e)(1). I.A.R. 41 (1987) sets forth the procedure for awarding attorney fees in appeals before this Court, but does not provide authority to award attorney fees. We conclude that there is no authority for the award of attorney fees against a worker's compensation claimant who unsuccessfully appeals to this Court.

## VII.

### CONCLUSION.

We affirm the decision of the Commission.

Costs to respondents. No attorney fees on appeal.

BOYLE and HERNDON, JJ., Pro Tems., concur.

SHEPARD, J., sat but did not participate in the opinion due to his untimely death.

BISTLINE, Justice, concurring specially.

I write separately to suggest that the responsibility of attributing Swanson's var-

ious symptoms to her industrial accident, or, to her pre-existing psychological conditions, or, to the non-industrial car accident was a very unusual and difficult task indeed. Swanson's attorney has argued here most persuasively that her psychological problems at the least were aggravated by her industrial accident and therefore, further psychological treatment was compensable.

It is my belief that in such circumstances as are here present the Industrial Commission would do well to on its own motion convene an independent panel of experts charged with the duty to examine the testimony, to weigh the causative factors, and assign a percentage to each of them. In essence this panel would serve the function very much like that of a jury in other civil cases. Such a procedure would be in keeping with the legislative directive of Idaho Code Annotated § 43–1404 (superseded): "The board, or member of the board to whom the matter has been assigned, shall make such inquiries and investigations as shall be deemed necessary."

This same provision was carried forward in the 1971 recodification of the worker's compensation law: Idaho Code § 72–714(3): "The commission, or member thereof, or a hearing officer, referee or examiner, to whom the matter has been assigned, shall make such inquiries and investigations as may be deemed necessary."

This important provision of worker's compensation law was last recognized, discussed and applied in the much cited case of *Pierstorff v. Gray's Auto Shop*, 58 Idaho 438, 74 P.2d 171 (1937), over a half-century ago. Since then it has laid dormant and appears to have gone unmentioned in Commission proceedings and in this Court's opinions reviewing Commission proceedings.

In *Pierstorff* a unanimous Court wrote as follows:

It appears from the record that at about 7 o'clock in the evening of October 22, 1935, and just shortly before it is claimed the accident occurred, respondent and his wife drove in the family automobile from their home in Lewiston, downtown, and, in passing the shop of respondent's employer, they noticed a light and stopped and respondent went in where he found V.A. Westfall, a fellow employee. It also appears that Westfall testified in behalf of respondent at the hearing before the board, but it does not appear either on direct or cross examination that Westfall was asked whether respondent's eye was, or was not, injured when claimant first entered the shop. And it further appears from the record that respondent's wife also testified in his behalf at the hearing, but that she was not asked either on direct or cross examination whether her husband's eye was, or was not, injured before their arrival at the shop on the evening of October 22d. No doubt counsel for the respective parties overlooked inquiring into the matter. The situation thus presented makes it most fitting to point out that by the enactment of the Workmen's Compensation Act the legislature intended to give injured workmen a speedy, summary, and simple remedy for the recovery of compensation in all cases coming within its provisions, that strict rules of procedure are not required, and that in every case where 'compensation is not settled by agreement' (sec. 43–1403, I.C.A.) [I.C. § 72–713], 'the Board, or the member of the Board to whom the matter has been assigned, shall make such inquiries and investigations as shall be deemed necessary....' (Sec. 43–1404, I.C.A.) [I.C. § 72–714(3)] and, furthermore, where, as here, no agreement for the payment of compensation is reached, and a hearing is had, and counsel for the respective parties overlook inquiring into a matter as important and material to a fair and just termination of the controversy as that above-mentioned, *it becomes the duty of the board to make full and exhaustive inquiry (Feuling v. Farmers' Co-operative Ditch Co.*, 54 Ida. 326, 334, 31 Pac.(2d) 683 [1934]), and to that end the board may not only examine any competent witness at the conclusion of his direct and cross examination upon all matters material and relevant to any issue, *but it may also subpoena*

*and examine other competent witnesses.*

*The board is already (without our suggestion) fully cognizant of its powers, under the statute, to become active in investigating these cases, and of the act that it is not required to remain merely passive and listen only to the evidence elicited by the parties or their counsel. It must be constantly kept in mind that it (the board) is an administrative and fact-finding body, exercising special judicial functions (In re Bones, 48 Ida. 85, 94, 280 Pac. 223 [1969]; Feuling v. Farmers' Co-operative Ditch Co., supra ), and, as such, it is its duty to ascertain and produce, or cause to be produced, all the available competent and material evidence concerning any and all claims presented to it for consideration and allowance.*

Pierstorff v. Gray's Auto Shop, 58 Idaho 438, 449–51, 74 P.2d 171, 176–77 (1937) (emphasis in original).

I list myself as concurring because Justice Johnson's opinion is well written, discusses sufficiently the issues presented, and refers to pertinent authority. In short, I believe the conclusion to affirm is almost inevitable. However, I am not as comfortable with that conclusion as I would prefer to be. The claimant in this case is as much the illstarred worker as Justice Donaldson portrayed the claimant in *Lyons v. I.S.I.F.,* 98 Idaho 403, 565 P.2d 1360 (1977). As Justice Johnson points out before the two successive accidents which physically injured her, she was already suffering from severe psychological problems by reason of her having left one style of life in Japan to take up another entirely different style in this county—undoubtedly added to by marriage, motherhood, and laboring at hard work in order to help provide for the family. Then within a period of less than forty days she suffered two severe head injuries—the first occasion at work, and the second while a passenger in an automobile. There is no doubting on reading the medical reports that she was thereafter experiencing severe pain, but as to the cause thereof, the medical profession could not agree.

The doctors were in more disagreement here than in most cases, which is understandable in view of the complexity of problems. It is inconceivable that any *one* doctor could say for certain that her pre-existing psychological problems were not exacerbated by having her head struck hard by a steel door; nor could any one doctor be expected to say for certain that her pre-existing psychological problems were not exacerbated by getting another severe blow to the head only thirty-eight days later in the automobile accident; nor could any one doctor be expected to say for certain that the injury to her head caused by the falling steel door was not aggravated or compounded by the second head injury incurred in the automobile collision into the guard rail. Nor could a doctor be expected to say for certain that the combined effect of two severe head injuries could be evaluated separately from each other, and that each and/or both could be evaluated disjunctively from her pre-existing psychological condition.

Much is made of Dr. Kennedy's testimony because whatever opinion he might express was not that of a defense-hired doctor, but rather claimant's own treating doctor, *i.e.,* if his testimony did not sustain her complaints, *ergo* and *a fortiori,* they were unjustifiably made and of no weight.

Dr. Kennedy, at his deposition taken by surety, admitted to having "a *definite* diagnosis as to what her problem was" when he diagnosed her initial head injury caused by the steel door. That diagnosis was that she "suffered strain of the neck muscles, the cervical paraspinal muscles, ... resulting in neck pain and headaches." Kennedy Deposition, p. 14–15. However, Dr. Kennedy did not even pretend to be all that definite when asked if her ongoing symptoms after the automobile accident were related to the steel door injury or the auto collision injury. Here his answers were less than forthright, but rather couched in equivocating phrases such as, "To the best of my knowledge," and "from that point of view," and "From my point of view, from the knowledge and information that I have." In addition, Dr. Kennedy in an-

swering did not himself say that he had an opinion as to the cause of her ongoing symptoms *which opinion was to a medical probability.* Defense counsel in interrogating him used the words, "an opinion with medical probability," only to ask *if* the doctor had any opinions. The doctor, however, did not use that language in making his responses.

This is not stated as being critical of Dr. Kennedy, but to illustrate the point that this was not the ordinary run of the mill case, but presents the circumstance where the claimant has a well-documented history of psychological problems [1] which predated the two separate but short-spaced accidental injuries to the frontal portion of her head.

Dr. Kennedy's testimony on direct examination was in answer to questions put to him by counsel for the party propounding him as a witness, namely the surety.

A. She was readmitted to the hospital on 2–15–81 by Dr. Lansche, one of my partners, who saw her in my absence. I then saw her in the hospital I believe it was the next day.

Q. And what were the complaints for which she was being hospitalized and treated?

A. She had been involved in an automobile accident and had been evidently thrown forward, striking her head against the windshield. She had also bruised her right knee and hand. She was seen in the emergency room and reported a severe frontal headache. She was evaluated by Dr. Lansche who felt that this was most likely cervical muscle strain from the trauma and admitted to the hospital. I then saw her I believe it was the next day.

. . . .

Q. Upon your return or your seeing her in the hospital, did you assume her care?

A. Yes, I did.

Q. And you are the one who made the decision as to when to release her?

A. Yes, I did.

Q. What was your diagnosis at the time she was released?

A. *I felt that she had acute cervical strain due to the automobile accident, which reinjured or exacerbated her previous cervical strain from the first admission. In addition she had multiple abrasions.*

Kennedy Deposition, p. 8–10 (emphasis added). The underscored language, it may be noted, was the doctor's own choice of words. Exacerbate is a word of common usage in compensation cases, and it is not a word of many definitions. According to Webster's Collegiate Dictionary it means to increase in severity. No dictionary has been found which suggests "recurrence" as an accepted meaning. Dorland's Illustrated Medical Dictionary (24th ed. 1965), includes "exacerbation" and defines it tersely as "increase in the severity of any symptoms or disease." Dr. Kennedy's statement that the automobile collision in his opinion exacerbated the physical injuries which claimant received when struck by the steel door is without doubt the single most important item of evidence in the record. It is another reason why it is not easy to feel entirely comfortable in joining an opinion which affirms the Commission's decision.

Commissioner Defenbach conducted the hearing and thereafter read the depositions of doctors Kennedy, Henson, and Whitenack, and a fourth deposition of Craig Patterson, an officer of the Idaho State Patrol. Commissioner Defenbach also considered medical reports and other documentary exhibits. The written decision prepared by Commissioner Defenbach is extremely thorough as to content and well-drafted and acknowledges Dr. Kennedy's choice of words as earlier mentioned: "Dr. Kennedy's impression at the time of discharging the claimant was an acute cervical strain secondary to the motor vehicle accident *and an* exacerbation of the claimant's [prior existing] cervical sprain ..." Finding No. VI. The bracketed words are included

---

1. Dr. Kennedy, in one of the many clinical notes made a part of his deposition, suggested that she should see a psychiatrist.

because Commissioner Defenbach of a necessity had to be referring to the prior cervical injury in order for there to be some symptom to exacerbate.

The prepared findings recounted the opinions of the doctors with regard to claimant's history, both as to the accident, resultant sicknesses, and the prior psychological and/or psychiatric history, and noting also that "The Commissioner finds particularly persuasive the opinion of Dr. Kennedy," the finding was made that "the opinions of Dr. Hansen and Dr. Powell to be more persuasive than the opinion of Dr. Whitenack with respect to the cause of the claimant's complaint and the relationship of her complaint to the industrial accident." Finding XIV. Finding XIII acknowledged that "Dr. Whitenack's opinion (was) that the claimant's condition was caused by the industrial accident ... that the claimant had encountered cultural differences in coming to the United States from Japan ... which created certain emotional and adjustment issues which also may be a factor ... that these factors had been combined with the physical injury to produce the claimant's continuing problems."

As stated at the outset, it is indeed a complex case, but the number and quality of defense experts made the outcome perhaps inevitable. Only Dr. Whitenack favored the claimant. Yet, in this bizarre set of circumstances, it does not seem at all improbable that he may have been correct in his deductions. To separate the two almost identical physical injuries, one coming directly on the heels of the other, coupled with occurring to a woman so afflicted emotionally, is at best difficult, if not impossible.

One would feel more comfortable if the extremely well-qualified experts brought into the arena had entered as non-partisan participants summonsed in by the Commission to aid it in this highly unusual case. There is a sentiment among the trial attorneys that it is inherently unfair for the defense employers and sureties to use panels of experts in compensation cases. An improvement in the system would restrict the number of experts available to the parties, and when the Commission desires independent expert opinion testimony, then to bring in such number of experts as the Commission may determine.