778 P.2d 774

John W. SWANDER,
Claimant–Appellant,

v.

BOISE CASCADE CORPORATION, employer, Defendant–Respondent.

No. 17608.

Supreme Court of Idaho.

Aug. 9, 1989.

John F. Greenfield, Boise, for claimant-appellant.

Moffatt, Thomas, Barrett, Rock & Fields, Boise, for respondent. John W. Barrett, argued.

JOHNSON, Justice.

This is a worker's compensation case. We affirm the decision of the Industrial Commission denying benefits to the claimant, John W. Swander.

## I.

### THERE IS SUBSTANTIAL COMPETENT EVIDENCE TO SUPPORT THE DECISION OF THE COMMISSION.

Swander filed a notice of injury and claim for benefits claiming that he suffered an accident and injured his back while working for Boise Cascade. Following a hearing, the Commission made findings of fact that included the following information:

1. Swander worked for Boise Cascade for fourteen and one-half years. At the time of his alleged injury that is the subject of this case, he was employed at the Emmett plywood mill, where he worked as a utility man performing various jobs as needed. He also worked on a farm owned by his father, where he operated farm tractors and fed cattle.

2. Swander had a history of preexisting back conditions. In 1975 he injured his back while operating a tractor on his father's farm. He later reinjured himself when he stepped into a hole while at work. When he was examined by a physician in 1975, it was the doctor's impression that Swander had a probable herniated disc. The doctor advised Swander to rest, as needed, and gave him medication. Swander lost no time from work at the mill, although his back bothered him at times.

3. Swander experienced more back pain in 1983. He was seen by an orthopedic physician, Dr. Rudd. Dr. Rudd noted muscle spasm in Swander's back. A CT scan disclosed a herniated disc on the left side at the L4–5 level sufficient to cause nerve root symptoms at the

L5 distribution. At the L5–S1 level, a calcified disc protrusion was noted at the middle and on the left, which was thought to be associated with symptoms in the left S2 nerve root distribution. Swander was seen periodically by Dr. Rudd. He was off work for about six weeks and was treated conservatively, although Dr. Rudd was of the opinion at that time that he would eventually have surgery for the herniated discs. Swander saw a chiropractor from time to time and took a prescription called Tolectin, prescribed by Dr. Rudd, on occasions when he had back pain. He also used a lumbosacral corset at times when he was experiencing back pain.

4. On May 21, 1986, Swander's wife called Dr. Rudd to request a refill of the prescription for Tolectin, because Swander had experienced a flare-up of his back pain. On June 2, 1986, another call was made to Dr. Rudd's office to report that Swander had lifted some heavy equipment the prior week and had a flare-up of pain in his back and occasionally in his right leg. The prescription was renewed.

5. On June 23, 1986, Swander was assigned to operate a forklift at the Boise Cascade mill. The workload was exceptionally high that day, and Swander was unusually busy and had to drive the forklift rapidly to keep up with the work. There were rough spots in the concrete floor at the mill. During the latter part of the shift, debris consisting of pieces of veneer were pushed onto the floor, making the floor even more uneven. At the end of the day Swander's back felt "real bad." He informed his supervisor the next morning that operating the forklift was causing him back discomfort, and he was assigned to do different work.

6. Swander went to see Dr. Rudd on July 18, 1986. Swander told him that after a day of driving the forklift, he had a flare-up of back pain with radiating posterior thigh pain in both thighs. An examination showed muscle spasm at the spine and radicular pain in the left leg, though not in the right leg. Compared to the 1983 examination, Swander showed a decreased ability to raise his right leg without causing back pain. A CT scan was performed on July 19, 1986. It was interpreted as being unchanged from the 1983 CT scan. Although Dr. Rudd encouraged Swander to undergo surgery, Swander desired conservative treatment. Dr. Rudd prescribed Tolectin, and Swander was allowed to continue to perform utility work at the mill. Later, Swander elected to have surgery, which was performed on August 27, 1986.

7. During the surgery, Dr. Rudd removed approximately twenty-five percent of the disc material at the L4–5 level. At the L5–S1 level, he removed an ossified disc herniation, which he chiseled from the disc space. Considerable degenerated disc material was also removed, as well as bone spurring and scar tissue. Dr. Rudd also found and removed an extruded free fragment of disc material lying near the S1 nerve root on the right side, which Dr. Rudd felt was the likely cause of Swander's acute pain and right-sided numbness which had bothered him the last week or two before the surgery. Dr. Rudd performed a spinal fusion from L4 to the sacrum in order to strengthen the structure of the spine.

8. The results of the surgery were good. Swander returned to work in January 1987. The leg pain that Swander had experienced for two to three years prior to the surgery was gone. Dr. Rudd expressed the opinion that Swander had a permanent physical impairment of twenty-five percent of the whole person, based on the two-level laminectomy and fusion.

9. Dr. Rudd testified that the findings at surgery confirmed those disclosed on the CT scans. He stated that the piece of disc material found at the L5–S1 level on the right side pressing on the right-sided S1 nerve root was not shown on the CT scan and was the

likely cause of Swander's right-sided numbness and acute flare-up of pain. Dr. Rudd testified that it usually takes a force of substantial proportion to break a fragment free from the back of a disc. He said that it then may move around by friction with other moving parts of the spine. He believed that it would have taken some period of time, days or weeks, for the fragment to move to where it was found at the nerve. He could not tell the age of the fragment. He believed that the fragment had separated itself from the disc no more than a few months, and possibly as recently as a few weeks, before surgery. When asked if repeated jolting by use of a forklift on June 23, 1986, could be the kind of trauma that would cause the free fragment, Dr. Rudd responded that all he could say was that it would have taken a substantial jolting or lifting trauma to rupture a free fragment from the back of the disc. Dr. Rudd did not offer an opinion specifically stating that Swander's activities on June 23, 1986, had likely caused the free fragment. When he was asked by defense counsel on cross-examination, Dr. Rudd agreed that he was unable to determine when it had occurred or the cause of the free fragment with a medical probability and that a determination would be in the realm of speculation.

10. Another orthopedic surgeon, Dr. Daines, testified on behalf of Boise Cascade. He said that the findings at surgery were compatible with a long-standing problem and not an acute injury. He pointed out that Swander had reported symptoms on the right side prior to June 23, 1986. This caused him to conclude that the free fragment was causing symptoms prior to Swander's alleged accident on June 23, 1986, and was not broken free by that accident. He believed that it would be merely speculation to attribute the cause of the free fragment to Swander's activities on June 23, 1986.

11. The cause of Swander's surgery and his physical impairment was his long-standing chronic back problems, which were well documented prior to 1986. There was no causal relationship between Swander's work on June 23, 1986, and the need for surgery or Swander's impairment.

Based on these findings, the Commission concluded that Swander had failed to sustain his burden of proof and had not established a compensable disablement caused by an accident arising out of and in the course of his employment. After a thorough review of the transcript and exhibits, we conclude that there is substantial competent evidence to support the Commission's findings. Since those findings support the decision of the Commission, we affirm.

## II.

### CONCLUSION.

The decision of the Commission denying Swander worker's compensation benefits is affirmed.

We award costs, but no attorney fees, to respondent.

BAKES, C.J., and HUNTLEY,* J., concur.

SHEPARD, J., sat, but did not participate in the opinion due to his untimely death.

BISTLINE, Justice, specially concurring.

This case is reminiscent of another worker's compensation case which was issued June 7, 1989, namely *Swanson v. Kraft, Employer and Ideal Mutual Insurance Co.*, 775 P.2d 629. There, too, I "concurred because Justice Johnson's opinion is well written, ... I believe the conclusion to affirm is almost inevitable." Again, as was so in *Swanson*, "I am not as comfortable

* HUNTLEY, J., fully concurred prior to his resignation August 7, 1989.

with that conclusion [to affirm] as I would prefer to be."

I noted there, and repeat here, that, insofar as reported worker's compensation cases are concerned, I.C. § 72–714(3), formerly I.C.A. § 43–1404, does not appear to have been utilized in Commission proceedings in the past fifty-two years—which is a long, long time for a beneficent statute to lay idle. It provides that "The Commission, or members thereof, or a hearing officer, referee or examiner, to whom the matter has been assigned, shall make such inquiries and investigations as may be deemed necessary." This provision was last mentioned in *Pierstorff v. Gray's Auto Body Shop,* 58 Idaho 438, 74 P.2d 171 (1937), where this Court stated that under the statute I.C. § 72–714(3), the Commission,

> [I]s not required to remain merely passive and listen only to the evidence elicited by the parties or their counsel. It must be constantly kept in mind that it (the board) is an administrative and fact-finding body, exercising special judicial functions (*In re Bones,* 48 Ida. 85, 94, 280 Pac. 223; *Feuling v. Farmer's Co-operative Ditch Co., supra* ) [54 Idaho 326, 31 P.2d 683], and, as such, *it is its duty to ascertain and produce, or cause to be produced, all the available competent and material evidence* concerning any and all claims presented to it for consideration and allowance.

Rather obviously, the duty mentioned therein has not been *constantly kept in* mind for fifty-two years. It would be surprising indeed to find that the referee who presided when Swander's claim was tried was aware of his authority and power to act in accordance with the unequivocating language of the statute and this Court's case-law mandate that it was in fact *his* duty to do so.

One only need look at two paragraphs in Justice Johnson's opinion to ascertain the need for independent medical testimony to have been acquired by the referee. Dr. Rudd's testimony (paragraph 9) is noted to have not offered "an opinion specifically stating that Swander's activities on

June 23, 1986, had likely caused the free fragment. When he was asked by defense counsel on cross-examination, Dr. Rudd agreed that he was unable to determine when it had occurred or the cause of the free fragment with a medical probability and that a determination would be in the realm of speculation." Dr. Daines' opinion for the defense (paragraph 10), was:

> [T]hat the findings at surgery were compatible with a longstanding problem and not an acute injury. He pointed out that Swander had reported symptoms on the right side prior to June 23, 1986. This caused him to conclude that the free fragment was causing symptoms prior to Swander's alleged accident of June 23, 1986, and was not broken free by that accident. He believed that it would be merely speculation to attribute the cause of the free fragment to Swander's activities on June 23, 1986.

116 Idaho p. 654, 778 P.2d p. 776.

The purpose of § 72–714(3) is to achieve justice. To further that purpose this Court in *Pierstorff* held that the commission or any of its personnel conducting hearings had the duty to see that the statute fulfilled its promise.

When Dr. Rudd would not, or could not, in *his* good conscience, answer the question "with a degree of medical probability," Swander could not make out his case. But, was it just Swander's case? Worker's compensation hearings are primarily administrative affairs, not trials. An injured claimant is entitled to sure and certain relief. The referee in the first instance, and the Commission in the second, because of the reluctance of Swander's only medical witness, had excellent grounds to cause him to be examined by a Commission-appointed doctor. By so doing the Commission would have its own independent evidence *concerning the claim presented to it for consideration and allowance.* As made abundantly clear by Justice Johnson's recitation of the required surgery, and the results, such evidence was highly indicative of Swander having had an industrial injury at or near the time to which he could point. The referee did not make a

finding that the back injury was not work related. This was indeed an appropriate case where all doubt could be put to rest by utilization of examination and report by a Commission-appointed independent medical examiner who would have access to the medical reports, findings and opinions of the doctors who did testify.